## SUPREME COURT.

PAUL D. HAGUE agt. DANIEL W. POWERS.

The *congress* of the United States has power to authorize the issue of *treasury notes to circulate as money.*

It has also power to make such treasury notes *lawful money* and a *legal tender* in payment of public and private debts.

Therefore, the act of congress passed February 25, 1862, authorizing the issue of treasury notes to the amount of $150,000,000, and declaring that such notes "shall be lawful money and a legal tender in payment of all debts, public and private, within the United States, except duties on imports and interest on bonds and notes of the United States," is not in conflict with the constitution of the United States, but is a *constitutional, valid law.*

*Argued at seventh district general term, Rochester, March,* 1863; *decided at general term April,* 1863.

*Present*—Hon. E. DARWIN SMITH, THOMAS A. JOHNSON and HENRY WELLES, *Justices.*

PAUL D. HAGUE, plaintiff, and Daniel W. Powers, defendant, both citizens of the state of New York, being parties to a question of difference, have agreed upon this case, containing the facts upon which the controversy depends, and submit the same to the supreme court of the state of New York, under section 372 of the Code of Procedure.

The facts are these: The defendant is a banker in the city of Rochester, and as such, was indebted to the plaintiff

in the sum of one hundred and thirty dollars, for so much lawful money of the United States, deposited with him prior to February, 1862, payable upon demand. The plaintiff heretofore, and since the 25th day of February, 1862, duly demanded of the defendant payment of said debt. The defendant then and there tendered to the plaintiff thirteen certain United States treasury notes, known as "legal tender notes," of uniform description, for ten dollars each, in payment of said demand.

The plaintiff refused to receive said notes, upon the ground that the act of congress of February 25th, 1862, under which the notes were issued and declared a legal tender, is not warranted by the constitution, and insisted on being paid in gold or silver coin ; and the defendant refused to pay otherwise than in such notes, claiming that the same were lawful money of the United States, or a legal tender.

At the time of such demand and tender, the notes aforesaid would purchase, in the markets of this state, eighty-seven dollars of gold or silver coin of the United States, and no more ; which relative market rates have been and are fluctuating from day to day.

> E. Peshine Smith and T. C. Montgomery, *counsel for plaintiff.*
>
> G. F. Danforth and W. F. Cogswell, *counsel for defendant.*

E. Darwin Smith, P. J.   The question presented for our decision in this case is—whether the act of congress, passed February 25th, 1862, authorizing the issue of treasury notes to the amount of $150,000,000, and declaring that such notes "*shall be lawful money and a legal tender in payment of all debts, public and private, within the United States,' except duties on imports and interest on bonds and notes of the United States,*" is a constitutional and valid law.   The whole provision is as follows :

" That the secretary of the treasury is hereby authorized to issue, on the credit of the United States, one hundred and fifty millions of dollars, of United States notes, not bearing interest, payable to bearer at the treasury of the United States, and of such denominations as he may deem expedient, not less than five dollars each; provided that such notes herein authorized shall be receivable in payment of taxes, interest, duties, debts and demands of every kind due to the United States, except duties on imports, and of all claims and demands against the United States of every kind whatsoever, except for interest upon bonds and notes, which shall be paid in coin, and shall also be lawful money and a legal tender in payment of all debts, public and private, within the United States, except duties on imports and interest as aforesaid."

The case states that the defendant was indebted to the plaintiff in the sum of $130, for money deposited with him prior to February, 1862, and the plaintiff demanded paymant of such debt. That the plaintiff tendered to him thirteen so-called legal tender notes, of uniform description, for ten dollars each, in payment of such deposit, which was refused upon the ground that the said act of congress under which the notes are issued and declared a legal tender, is not warranted by the constitution, and insisted upon being paid in gold or silver coin; " and that the defendant refused to pay otherwise than in such notes, claiming that the same were lawful money of the United States, or a legal tender."

It is impossible for us to approach the examination and discussion of the questions arising upon this submission without a deep sense of their great magnitude, and of the very serious interests and consequences, public and private, involved in their ultimate decision. Perhaps in no single action questions of equal, certainly none of greater importance, were ever submitted to a judicial tribunal in this or any other country.

It is, however, a source of some gratification and relief to us that the responsibility for their final decision will devolve upon others, and that we shall probably do nothing more than contribute something to the discussion which they will be likely to undergo in their progress to the tribunal constituted for the final determination of all questions arising under the constitution of the United States.

We are called upon to declare the act of congress of February 25th, 1862, above mentioned, unconstitutional. The consideration of this question requires us to give a construction to the constitution of the United States, or to several of its provisions.

Under our system of government, it is the province and duty of the judiciary, when properly called upon so to do, to bring all acts of congress and of the state legislatures to the test of the constitution, and to declare all laws invalid which are *clearly and palpably* in conflict with the fundamental law. But the presumption is in favor of the validity of all acts of the legislature, whether state or national, and the courts should only declare acts unconstitutional when they are clearly so, beyond all reasonable doubt. This is the settled rule. (*Fletcher* agt. *Peck*, 6 *Cranch*, 128; *Ogden* agt. *Saunders*, 12 *Wheat.*, 29; 24 *Barb.*, 466; 14 *Mass.*, 345.)

The chief questions for examination resolve themselves into two leading points of inquiry:

1st. Has congress the power to authorize the issue of treasury notes to circulate as money?

2d. If such power exists in congress, can it make such treasury notes lawful money, and a legal tender in payment of public and private debts?

Before proceeding to the discussion of these questions, it is important to determine the principles of interpretation which should be applied in the construction of the constitution of the United States. That constitution was framed and designed for the establishment of a NATIONAL GOVERN-MENT.

The confederacy of the revolution, after four or five years of peace, had proved a failure. It was found entirely inadequate for the purpose for which it was formed, when the pressure of war was withdrawn from the colonies, and the people turned their attention to the arts of peace, and began to develop the enterprise and resources of the country.

The convention which met in Philadelphia in 1787, to revise the articles of confederation, were deeply impressed with a sense of their utter insufficiency, and after some discussion, exhibiting their defects, as its first deliberate act, after its organization, resolved " that a national government ought to be established, consisting of a SUPREME LEGISLATIVE, EXECUTIVE and JUDICIARY."

After this the convention proceeded to devise and frame the present constitution, except the few supplementary sections afterwards added upon the recommendation of the state conventions or legislatures. The constitution, upon its face, was designed to be, and is, a great FUNDAMENTAL CHARTER OF GOVERNMENT. It provides for an organization of government to be possessed of the chief attributes of *sovereignty* and *supremacy*. The constitution was to be, and is, the *supreme law of the land*, and all the powers exercised under it, executive, legislative and judicial, within their appropriate sphere, were, and are, sovereign and paramount. The character of the provisions enumerated and granted in the constitution, all tend to the conclusion that it was the purpose of its authors to make of the American people one nation. The power of making treaties, of declaring war and making peace, of imposing taxes for the national defence and general welfare, of enacting uniform laws for naturalization and bankruptcy, and the provision that the citizens of one state should have equal rights and privileges in all others, and that allegiance should be due to the general government, and all officers, state and

national, be bound by oath to support the constitution—all imply the same purpose.

The constitution, too, derives its authority from the *people*, as much so as the state constitutions. Its preamble so declares, and it was, in fact, adopted by conventions of the people called in the several states for that purpose. All the original inherent powers of the people for self-government are vested in the national and state governments, each in their proper sphere. The general government is vested with the appropriate governmental powers of a national character necessary for the common defence and general welfare, and the powers for local government are vested by the state constitutions in the state governments. The powers of the general government, it is true, are special and enumerated; and such as are not granted are reserved to the states or to the people.

But the powers thus granted to the general government are granted for the benfit of the *grantors*—the people. They are, therefore, not to be construed like grants to a corporation by a legislature, of rights and immunities, for the special benefit of the grantees. The officers of the government, who exercise its powers, are mere agents of the people, and have no interest in the powers conferred. In this view of the character of the powers conferred upon the national government by the constitution, the rule of construction in respect to such powers must be *liberal*, and such as will further the great objects of the grant, and enure to the benefit of the beneficiaries—the great body of the people.

Another consideration of importance in this connection is, that the powers delegated or enumerated in the constitution are conferred in general terms, simply enunciating general principles or outlines, and that consequently every grant of power carries with it all the incidental and implied powers essential to its due and full exercise and enjoyment.

We come then to the question:

I. Had congress power to authorize the issuing of treasury notes to perform the office of money?

It is not claimed that this power is conferred upon congress by any *express* provision of the constitution.

But it is insisted and urged in the argument made before us, that the power to make the law in question is conferred upon congress by the 5th subdivision of article 8, of title 1, of the constitution, which provides that congress shall have power "to coin money, regulate the value thereof, and of foreign coin, and fix the standard of weights and measures."

This provision should doubtless be construed in connection with subdivision No. 1 of the 10th section, which is as follows: "No state shall enter into any treaty, alliance or confederation, grant letters of marque and reprisal, coin money, emit bills of credit, make anything but gold and silver coin a tender in payment of debts," &c.

These two provisions, construed together, most conclusively show, I think, that it was the purpose of the framers of the constitution to give to the national government exclusive control of the currency of the country, and to secure thereby *one currency* for the whole country—one national uniform currency. But that currency most evidently was to be a *metallic* one. Gold and silver could only be made a tender in payment of debts by the states. The national government is to *coin* money—that is, to fix the *national stamp* upon the metals which are to be used as *money*; to determine the character of the national currency, and what should be the measure or standard of value, and what the different kinds used for money, and into what denominations the money should be divided, or of what it should consist. It was subsequently made a decimal currency by act of congress, and as such has since remained. But the *money of the constitution*, it seems to me very clear, was to be *hard money—metallic money*. It

was to be *coined* from metals which had intrinsic value in commerce throughout the civilized world. Nothing else was or is money under these provisions of the constitution.

The language of these two provisions is too explicit, it seems to me, to admit of any other construction. But the cotemporaneous history and construction of these provisions confirm this view.

The original section drafted and proposed to the convention, which provides that congress may borrow money, read as follows:

" To borrow money and emit bills on the credit of the United States."

The words, " and emit bills," were stricken out upon discussion, on the ground that they might seem to warrant or authorize the issuing of paper money by the government. ( 3 *Madison Papers*, 1344.)

Mr. Wilson, who was a prominent member of the convention, said: " It would have a most salutary influence on the credit of the United States to remove the possibility of paper money."

Mr. Langdon said that he had rather reject the whole plan than retain the words " and emit bills." The words were stricken out by the vote of nine states to two.

*Bills of credit*, as the term is used in the constitution, meant *paper money*. It had reference to the bills of credit issued by the states and by congress during the war of the revolution, generally called and known as *continental money*, which fell into so great disrepute.

Mr. Madison, in the 40th number of the Federalist, speaks of the prohibition to the states to issue bills of credit as a prohibition against *paper money*, referring to the " pestilent effects " produced by its circulation during the war. The prohibition to the states against issuing bills of credit, and the refusal of the convention to give to congress express power to issue such bills, must be deemed, I think, indicative of the purpose and intent on the part of

the framers of the constitution, to give to nothing the cha-
racter and quality of *money*, except *gold* and *silver* and *other
precious metals*. The evils of banks of circulation, what-
ever they are, were not before them, or had not been expe-
rienced, and they therefore did not prohibit the creation
by the states of banking corporations with the power to
issue bills. There was then in existence but one bank in
the United States—the Bank of North America—which
was a specie-paying bank, and its notes supposed to repre-
sent specie. They had no idea of an irredeemable paper
currency, except such as consisted in bills of credit—such
as had been issued by congress and by the separate states
during the war.

But notwithstanding the convention refused to give to
congress power to issue bills of credit in express words,
the constitution most unquestionably does grant that power
as an *incidental* or *implied* power.

In the debate on the question of striking out the words
" *emit bills of credit*," Mr. Madison said, " Will it not be
sufficient to prohibit making them a *tender* ? This will re-
move the temptation to emit them with unjust views, and
promissory notes in that shape may in some emergencies be
best." Gouverneur Morris said, " Striking out the words
will leave room still for notes of a responsible minister,
which will do all the good without the mischief."

Mr. Gorham said, " The power, as far as it will be neces-
sary or safe, is included in that of borrowing." In the
note to this debate, as given in Mr. Madison's Works, volume
3, 1846, it is stated that the vote of Virginia in the affir-
mative, on striking out, was occasioned by the acquiescence
of Mr. Madison, who became satisfied that striking out the
words would not disable the government from the use of
public notes as far as they would be safe and proper.

That Mr. Madison remained of this opinion, is evident
from this recommendation in his annual message of Decem-
ber 5, 1815, in which he says, after speaking of the opera-

tions of the state banks, and the operations of a national bank:

"And if neither of these expedients be deemed effectual, it may be deemed necessary to ascertain the terms upon which the notes of the government, no longer required as an instrument of credit, shall be issued upon motives of general policy as a *common medium of circulation.*"

But independently of the intent and opinions of the framers of the constitution, the power to issue treasury notes, I think, may properly be deemed included in several of the express grants to congress. The power to "borrow money on the credit of the United States," includes or implies, as an incidental power, essential to the exercise of the original power, an authority to issue the requisite securities, or evidences of debt, for the money borrowed. This must of necessity be in the shape of treasury bonds or notes, and in such form as congress or the secretary of the treasury may prescribe or deem proper. Subdivision 6, of section 8, grants power to congress "to provide for the punishment of counterfeiting the securities and current coin of the United States," thus recognizing the valid existence of securities of the United States, and placing them in the same relation and under the same protection as the current coin of the United States.

And the provision of the same section, that congress shall have power "to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defence and general welfare of the United States," also includes, I think, a power to issue treasury notes in anticipation of the receipts from taxes. Such notes may also be necessary as a medium of payment of taxes, and imposts, and excises.

This power to levy and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defence and general welfare, is perhaps the most important grant of power in the constitution. It was probably for

the want of this power, more than for any other defect, that the confederation proved a ·failure.

This provision also assumes that the government will have *debts* to be paid, and this concurs with the power allowing government to borrow money—to issue evidences of debt or securities.

It is quite apparent, indeed it seems self-evident, that *money* is indispensable for the maintenance of civil government. Mr. Hamilton called it the "*vital principle of the body politic,*" as "that which sustains its life, and enables it to perform its essential functions." Congress, under this provision, has the unlimited and uncontrollable power of taxation, except that "all duties and imposts and excise shall be uniform throughout the United States." Its power is *absolute, sovereign* and *supreme.* It is to levy and collect taxes, "to pay the debts, and provide for the common defence and the general welfare." Congress is the exclusive judge of what is essential to the "public welfare, and what is necessary or proper for the *common defence.*" For these great governmental purposes, at all times, in peace and war, money, and in large amounts, is demanded—is absolutely indispensable. Congress must determine the subjects for taxation, and provide the ways and means to raise the money required. Certainly it may anticipate the collection of taxes by borrowing money, and I cannot see why, if metallic money is scarce, and the collection of taxes slow, difficult or impossible from want of a· circulating medium, it may not authorize the issue of treasury notes to supply the deficiency.

In the celebrated argument of Mr. Hamilton on the constitutionality of a bank of the United States, in February, 1791, he says on this subject: "To designate or appoint the money, or a thing in which taxes are to be paid, is not only a proper but a necessary *exercise* of the power of collecting them. The payment might have been required in the commodities themselves; taxes in kind, (however ill-

judged,) are not without precedents even in the United States; or it might have been in the paper money of the several states, or in the bills of the Bank of North America, New York or Massachusetts, all or either of them; or it might have been *in bills issued under the authority of the United States*. The appointment of the money or thing in which taxes are to be paid is an *incident to the power of collection.*"

In a debate upon a bill to authorize the issue of treasury notes in February, 1838, Mr. Calhoun, in support of the bill, said : " The right had been exercised from the commencement of the government *without being questioned*, and according to his conceptions came within the power expressly granted to congress to borrow money, which means neither more nor less than to raise supplies on the public credit."

The act in this case passed with the support also of Silas Wright, Mr. Benton, Robert J. Walker, and all the senators of the hard money school, and was approved by Mr. Van Buren, who was then president. The act in this instance amended an act for the issue of $10,000,000 treasury notes, passed at the September extra session of 1837, which was supported and voted for by Mr. Webster, who on repeated occasions affirmed the power of the government to issue treasury notes. ( *Vide 4th volume Webster's Works*, *p.* 368, 474, 543 *and* 546 ; *and 5th id.*, 136 *and* 156.)

This practice of the government, under all administrations, from its origin, with the sanction of all the presidents and leading statesmen of the country, seems to me, ought to put this question, so far as relates to the power of congress, forever at rest.

The power to issue the notes being granted or assumed, it becomes then purely a matter in the discretion of the legislature in what form, size and respective amounts they shall be issued. The fact that they are of such denominations, and form, and amounts, as conveniently to go into

circulation, and serve the office of money, cannot affect the question of the power to issue them, or detract from their validity as lawful government securities. We come then to the remaining question :

II. Assuming that congress has power to authorize the issue of treasury notes, can it make such notes a legal tender ?

If the argument is sound, that congress has the power to authorize the issue of treasury notes and pay them out to the public creditors, who will voluntarily receive them as a substitute for money, and that they are valid government securities, I cannot see why it does not follow as a necessary and legitimate consequence, that it has the power, if the occasion will justify so extraordinary a measure, to declare what shall be their commercial value ; in short, to declare that they shall be received and held as lawful money, and a legal tender in payment of all debts, public and private. They are in effect professedly issued to supply the place of money, and to furnish a circulating medium. Very clearly it seems to me that government has the same power, if the necessities of the case require it, to protect these notes from depreciation, and to enhance their value by making them a legal tender, as much as it has to prevent the debasement or counterfeiting of coin. What it creates it may protect by all suitable laws for that purpose, and by what means it will do so is especially a matter within the discretion of the law-making power.

I agree with the remark of Senator Sumner, who, in the discussion in the senate in respect to the act in question, said : " It is difficult to escape the conclusion that if congress is empowered to issue treasury notes, it may affix to these notes such character as shall seem just and proper, declaring the conditions of their circulation and the dues for which they shall be received. Grant the first power and the rest must follow." Confined to the act under discussion, and as a question of legislative discretion, I think

this remark entirely correct.   But this conclusion may not be readily admitted, and I will therefore proceed to state more fully the reasons on which I think it can be sustained. The power of congress to make these notes receivable for government dues, and payable to all public creditors who will voluntarily receive them, cannot be doubted.

The debatable question is, whether they can be made by law of congress a compulsory legal tender in payment of public and private debts.   The provision of the statute is, that they " shall *be lawful money and a legal tender in payment of all debts, public and private.*"   Most clearly they are not money.   Upon their face they are mere promises to pay money.   Each of these bills or notes upon its face contains a *promise* on the part of the United States to *pay* to the bearer ten dollars.

Strictly, this promise calls for and can only be fulfilled by the payment of ten dollars, in *gold or silver coin.*

The word " dollars," printed on the face of these notes, means silver or gold coins, with the *stamp* of the United States authority thereon impressed, fixing their value and character.

This is the only known and legal standard of value in the United States.   The dollar is the unit of value, and means, wherever the word is used or named in any contract, a piece of silver coin composed of $412\frac{1}{2}$ grains of standard silver, or gold of equal value, according to the standard of value fixed by law.   This is indisputable.

The question then is : Can congress *substitute a governmental promise to pay* ten dollars, or any other medium of value or mode of payment of debts which shall be effectual in law to discharge a contract calling for *money*, and which confessedly means gold and silver coin ?   The act in question professes to do this.   It substitutes a promise to pay money based upon the credit of the government for the actual payment of money.

This, I agree, can only be done by the sovereign autho-

rity of the government, and involves the highest exercise of sovereign power. Congress possesses, I think, this sovereign power. Besides the powers to lay and collect taxes, duties, imposts and excises, to borrow money on the credit of the United States, and to provide for the punishment of counterfeiting the securities and current coin of the United States, hereinbefore considered, congress has power "to declare war." This is an unquestionable sovereign power, and binds the allegiance of every citizen; for the crime of treason will be committed by any citizen who shall resist by force any law of the United States, or adhere to their enemies, giving them aid and comfort, and congress has power to declare its punishment. The president and senate have power to make treaties, which also bind the nation and become its supreme law.

Congress has power *"to raise and support armies."* Under this power congress can provide for calling upon, impressing and compelling every citizen personally to aid in carrying on the war it has declared. This power includes *any* and *every means* adapted to the *end* of war, in the opinion and discretion of congress.

Congress has power " to provide and maintain a navy." Under this power it can take every ship of our citizens and appropriate it to the public use, to constitute a navy, and take any other means adapted to the use or object of a navy, and to maintain and support it. The power is *absolute and unqualified,* like the power to raise armies.

Congress has power also " to provide for calling out the militia to execute the laws of the Union, suppress insurrection, and repel invasion," and to provide for organizing, arming and disciplining the militia, when employed in the service of the United States.

It has power also to erect forts, magazines, arsenals, dock-yards, and other needful buildings for war purposes.

The United States also is bound to guaranty to every state a republican form of government, and to protect

each of them against invasion, and against domestic violence.

And congress has power " to make all laws which shall be necessary and proper to carry into execution the foregoing powers, and all other powers vested in the government of the United States, or in any department or officer thereof."

All the above enumerated powers are in their nature and character *absolute* and *sovereign*, and all are essential to the existence and maintenance of a national government, and all require and involve for their exercise, large expenditures of money.

The case before us has the following statement : " Since the spring of 1861, the government of the United States have been continually waging a war, of hitherto unexampled magnitude, for the suppression of a powerful rebellion, and have been compelled, in so doing, to make expenditures amounting to over one thousand millions of dollars."

Aside from this statement, I suppose we are entitled to know judicially, that the government has in the field a vast army of nearly a million of men, and a large and increasing naval force, demanding *immense expenditures of money*, much larger than can be immediately supplied by the metallic currency of the country, or the ordinary resources of the government.

The power to raise money by taxes, imposts and duties, is unlimited for the purpose of such war ; but most obviously money cannot be raised in this way fast enough, and in sufficient amount to meet the exigencies and demands of the government in raising and maintaining its armies. It has, therefore, no other resource but to " borrow money." The power to " borrow money " is likewise entirely unlimited, and may be exerted in connection with the taxing power in anticipation of the receipts from taxes, duties and imposts, and may also be exerted as an

independent power to an unlimited extent. It is, as I conceive and have endeavored to show, an *express power* under which treasury notes may be lawfully issued. The issue of such notes, therefore, is simply a process *to borrow money of the people of the United States*, and the provision that such notes shall be a *legal tender* is, or may be, an essential *means* to that end. It is or may be essential to give currency to the notes and preserve them from depreciation, from the natural laws of trade, and the arts of speculators or of disloyal citizens.

For the purpose of carrying on the war in which our people are engaged, the government may lawfully seize and appropriate the property of any citizen for the public use. The sovereign power of a state may do whatever is necessary for the safety and defence of the state. The only limit to its power under our constitution is that the means be, in the opinion of congress, " *necessary* and *proper*" to accomplish the end in view in the exercise of any of the enumerated powers of government.

If the government may seize and appropriate the property of the citizens without limit, to carry on the war and for the common defence, certainly it may take it by means of *forced loans*. All governments in times of war have been obliged to resort to such loans, and their lawfulness is unquestionable, for " *salus populi suprema lex*," is the universal rule among all nations in times of war.

It is said that it may be necessary for the government to borrow money and issue treasury notes, but that does not make it " *necessary or proper*," under the general clause of section 8 of the constitution, above recited, to make such notes a legal tender.

This I conceive to be purely a question of legislative discretion.

Money is necessary to carry on the war, and sustain the government in the exercise of all the foregoing enumerated powers. If, in the opinion of the legislature of

the nation, it is necessary and proper to issue treasury notes and to make such notes a legal tender, in order to procure the requisite money, and keep up the credit of the government and prevent its failure and overthrow, most certainly the legislative authority of the nation has the sovereign and unquestionable right so to declare and so to enact.   It does not pertain to the judiciary to question the propriety of the exercise of its undoubted discretion on the subject.

In the celebrated case of *McCullough* agt. *The State of Maryland,* (*Wheaton,* 411,) Chief Justice MARSHALL, in delivering the opinion of the court said, that "when the law is not prohibited and is really calculated to effect any of the objects entrusted to the government, to undertake here to inquire into the degree of its necessity would be to pass the line which circumscribes the judicial department, and trench on legislative ground."

The grant of the powers to declare and carry on war, to raise and equip armies, to construct and employ a navy, to arm the militia, build forts and arsenals, suppress insurrection and repel invasion, is a grant of the requisite power to use and employ all the means, agencies and instrumentalities known among civilized nations to effect those objects, and is a grant necessarily of the power to procure and use the requisite money for these purposes, and by *any means* that congress may deem "*necessary and proper.*"

Treasury notes confessedly may be one of those *means.* I speak of treasury notes issued for the purposes of a *currency,* and designed to be used and put into circulation as *money.*   There is an obvious distinction between such treasury notes, and notes of large size issued expressly to be sold or negotiated in the market for investment, like ordinary securities of corporations and individuals. The government must have the same right to issue such paper as individuals or corporations, and such has been

the character of most of the treasury notes heretofore issued by the government.

Those authorized by the act passed in 1812, bore an interest of five per cent.; and by the act of 1815, notes of the denomination of one hundred dollars and less were authorized, transferable by *delivery*, and without interest. Bills under this act were issued of as small denomination as ten dollars. By the act of 1827, hereinbefore referred to, notes were authorized to be issued as small as fifty dollars. They were to be issued at such interest as the secretary of the treasury might direct, and were in fact issued at a mere nominal interest of one, two and three per cent., and this act, with the same provisions, making the notes transferable by *delivery*, and payable *to bearer*, was continued by acts in 1838, '39, '40, '41, '42 and '45. This latter class of notes were obviously issued for *circulation* among the people, and to be paid to the public creditors *as money*. But under the act of February, 1862, the notes were to be of such denominations as the secretary of the treasury might deem expedient, not less than five dollars, to be payable to the bearer, and not bear any interest. Those offered to the defendant in this action, were of the denomination of ten dollars each, and were of the size and similitude of bank bills, and made and designed professedly for circulation as money. They were intended to be, and notoriously are, paid to the civil, naval and military officers, to soldiers, contractors and other government creditors, as *money*. Such payments would be quite unavailing and very unsatisfactory, if such notes were not receivable by the community at large, and did not perform the office of a circulating medium. For this purpose, the act makes them a legal tender in payment of all public and private debts. This makes them perform the *office of money* in its highest character, as a *legal substitute* for gold and silver coin. In ordinary times of peace there would be no occasion for

such an act.   In such times treasury notes would proba-
bly be at par throughout the Union, and equivalent to
gold and silver.   Certainly they would, if like the bills of
specie-paying banks, they were immediately convertible
into specie at the various sub-treasuries of the govern-
ment, and receivable for all government dues, and the
legal tender clause therefore would be entirely unneces-
sary.

But now the case is notoriously otherwise.   The issue
and use of treasury notes as *money*, as *paper money*, issued
upon the faith and credit of the government, and not con-
vertible immediately into specie, has been and is an *im-
perative governmental necessity*.  The same necessity creates
the law of the case, and makes it constitutional and lawful
for congress, in order to render such notes as available as
possible, and to give to them all the credit and value which
the law can confer, to make them serve as a substitute
for gold and silver in the discharge of all public and pri-
vate debts.   The act in this respect necessarily tends to
bring to the aid of the government, in keeping up the
credit of these notes, the interest, as it is the duty, of
the whole commercial, moneyed and creditor classes of
the people.

If it thus operates to tax capital, the tax is not unjust,
for the value of all property depends in a large degree
upon the maintenance and stability of government, and
the amount of such tax will depend very much upon the
patriotic support which capitalists give to their gov-
ernment, and the efforts they make to sustain its credit.
But it is said the act impairs the obligation of contracts.
Congress is not prohibited from passing laws which im-
pair the obligation of contracts.   This prohibition applies
only to the states.   Congress may confessedly debase the
coin.   It may make lead or iron money.   It may make
the copper cent a dollar, and perform the office of a dollar.
This would indirectly impair the obligation of contracts;

and congress may pass many other acts which would have that effect. The expediency and propriety of such acts is another question. And it is said that congress is not expressly authorized to declare any kind of money a legal tender. It has express power "to coin money and declare its value." The money it coins is the legal measure of value in the performance of all contracts, and this is equivalent to making it a legal tender. It becomes a legal tender by being made the legal standard of value— legal money.

The powers of the national government are too often considered and discussed as though it were a mere municipal corporation. It is, as I conceive, a fundamental mistake that the government of the United States does not possess as full, ample and extensive powers to provide for the "general welfare and the common defence," as any other government existing among men. It possesses for this purpose all the original inherent power of the people to protect themselves, and to provide for their self-preservation and general welfare. A state is but an aggregation of individuals, and certainly the rights which men possess in a state of nature, to protect themselves from injury and to preserve life, they do not lose when combined into civil society. Government is instituted among men to protect their natural rights, and national life stands upon the same footing as individual life. It is the great office and duty of government to protect and defend it, and any law essential to that end is within the just power of the national legislature.

If the British parliament had, in a time of national peril, passed an act authorizing the issue of government notes, and making them a legal tender in the payment of debts, no man of the slightest legal intelligence would doubt or deny the validity of the law; and this was practically done in England by act of parliament, recognizing and allowing a suspension of specie payments by

the bank of England in 1797, which continued till 1823. During this period the bank of England notes were practically a legal tender, the bank being prohibited from paying its notes in cash.

There is probably not a government in Europe which has not been compelled in time of war, or national distress, to suspend specie payments, and make forced loans of the people by making paper promises to pay, in some form, lawful money and a legal tender in payment of debts. This has been done in France in repeated instances, and as late as in 1848 the bank of France was authorized to suspend specie payments, and its notes made a legal tender. It may perhaps be said that the governments of Europe may exercise such powers because they are not restricted or limited by written constitutions.

The powers of our government are none the less ample because they are enumerated in a written constitution. The essential powers of government are substantially the same under all forms of goverment, and are delegated and entrusted to rulers to be exercised alike for the common good. Power may be, and doubtless is, much abused, under all forms of government, but in republican governments the people possess an advantage and security over others, in the fact that they elect their own rulers, and can dismiss from office those who abuse their trust, and by this process repeal unwholesome laws. This is the only remedy against laws, however injudicious or unwise, which are within the legitimate discretion and power of legislative bodies under our form of government.

Upon the whole case I think my argument tends to establish the following propositions or conclusions :

1st. That the issue of treasury notes is warranted by the constitution of the United States at all times, in the discretion of congress, as a medium for the payment of taxes under the taxing power, and as a form of security

to the public creditors for money loaned under the power " to borrow money."

2d. That the form, size and denomination of such notes, and the making of them in the similitude of bank bills, and payable to bearer, so as to be transferable by delivery, and go into circulation as money, are matters entirely within the discretion of the legislature; and so far as relates to their voluntary receipt and circulation by the public, they stand upon precisely the same footing as bills of exchange or promissory notes issued by private individuals or corporations, and rest exclusively upon their credit as merchantable securities.

3d. That the power to make such notes a substitute for money, and a legal tender in payment of debts, may rest as an incidental or implied power upon the power to " impose taxes, duties and imposts," and upon the power, " to borrow money," and also upon the power given to congress " to pass such laws as shall be necessary and proper to carry into effect the other specified powers."

4th. That in connection with these powers, the power to declare war, raise and support armies, to provide and support a navy, to suppress insurrection and repel invasion, being great governmental and sovereign powers, include and imply a grant of all the means necessary to the end of the powers granted, and that money, being an indispensable agent, and necessary to carry such powers into effect, the power is implied to command, obtain and secure it by any practicable means known or practiced among civilized nations ; and that the issue of treasury notes, making them a legal tender in payment of debts, is a proper and lawful means to that end—a process of borrowing money from the people—or making from them a forced loan to meet the governmental necessities, and is entirely within the legitimate power of congress, as the sovereign legislative authority of the nation.

It follows from these premises, that the act in question

was fully warranted by the express and implied power given to congress, and was and is a measure entirely within the discretion of the national legislature, and with which the judiciary has no rightful authority to interfere.

It is a source of much satisfaction that we can come to this conclusion, and sustain the validity of the act in question.

It would have been exceedingly unfortunate, and the occasion of profound regret if, in this state, whose people for the last two years have been pouring out their blood and treasure like water, to maintain the authority of the national government and the supremacy of the constitution, the judiciary or any branch of the superior courts of the state should have felt constrained to declare an act of such great public importance to be in conflict with the fundamental law.

We know from the debates in both houses of congress, that it was passed with extreme reluctance, and that nothing but a deep conviction of its *absolute necessity* could have induced a sufficient number of senators and members of the house of representatives to have voted for it—to have secured its passage.

It was passed most undoubtedly in that spirit of patriotism which led our fathers of the revolutionary period to encounter and to endure all the evils of *continental money*, and in the belief that the great mass of our people would cheerfully meet and endure the same evils—if need be—before they would consent to the dismemberment of the Union and the overthrow of constitutional government and popular institions on this continent..

Judgment should therefore be given for the defendant, with costs.

JOHNSON, J. The tender by the defendant of the legal tender notes, in satisfaction of the plaintiff's demand, was valid, and they should have been received by the

latter unless it shall be found upon examination, that his objection, that the act of congress under which such notes were issued and declared to be a legal tender is unconstitutional, was tenable.

The act in question, which was approved February 25, 1862, amongst other provisions, declared that these notes, when issued, " shall also be lawful money and a legal tender in payment *of. all debts, public and private*, except duties on imports and interest as aforesaid."

Any law made by the congress of the United States, in pursuance of the constitution, and duly approved, is " the supreme law of the land, and the judges of every state shall be bound thereby, anything in the constitution or laws of any state to the contrary, notwithstanding."— (*Constitution, art.* 6.) Unless, therefore, it can be shown that the act of congress in question is not in pursuance of the constitution, it is the supreme law of the land, and the tender was valid and must be held to satisfy and discharge the demand created by the deposit.

The general government possessing all the essential attributes of a national sovereignty, and the legislature being the branch thereof invested with paramount authority, the presumption is unquestionably in favor of the validity of any and all of its acts, and it lies primarily with the party objecting to show that any particular act is in derogation of the constitution. This, however, is of little consequence where the standard is a written organic law, which may always be appealed to, and must determine in all cases where the authority to enact is seriously challenged.

In considering the question thus presented, it must be admitted in the outset that the government of the United States is limited in its powers and authority to the exercise of those conferred by the organic law, in which it has its being, and that all powers not delegated to it by the constitution, nor prohibited by it to the states, are

reserved to the states respectively or to the people thereof.

But it by no means follows from this, that it can take nothing by implication, like a special and inferior tribunal created by statute. It is still a national sovereignty, and within the just scope and measure of the powers with which it has been endowed, is as supreme and potent in its authority as any other human government. And in passing upon the question of the constitutionality of any law of congress, this important consideration is not to be lost sight of.

The object which the framers of the constitution and the people who ratified and adopted it as the organic law of this national government, had in view, is clearly and plainly expressed in the preamble. It was, amongst other things, to " establish justice, insure domestic tranquillity, provide for the common defence and general welfare, and to secure the blessings of liberty to ourselves and our posterity."

To secure the attainment of these cardinal ends of all government, the powers deemed necessary or essential thereto were enumerated and conferred under separate and distinct general heads; each of which necessarily comprenends and embraces, as it was intended, all the subordinate and auxiliary powers necessary, or incident to the supremacy of such general head of power. And hence, in section eight, after specifying the several powers which congress shall have, in subdivision seventeen, the power is in express terms given " to make all laws, which shall be necessary and proper, for carrying into execution the foregoing powers, and all other powers vested by this constitution in the government of the United States, or in any department or officer thereof." Here is a plain and unambiguous test in the text of the constitution itself, if the rule prescribed by the statute is not within the plain letter or evident scope of the power enumerated.

The question then is, whether the law is necessary or proper for carrying into execution all or either of the enumerated and granted powers.   If it is either necessary or proper without being absolutely necessary, the statute is valid and becomes the supreme law of the land, binding upon the judges of every state.

But to come more directly to the statute in question : Has congress the power within the letter or evident meaning of either of the enumerated powers conferred, to declare these treasury notes lawful money and make them a legal tender in payment of all debts, public and private ? Among the powers enumerated and expressly conferred, are these : to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defence and general welfare of the United States; to borrow money on the credit of the United States; to regulate commerce with foreign nations, and among the several states, and with the Indian tribes; to coin money and regulate the value thereof, and of foreign coin; to provide for the punishment of counterfeiting the securities and current coin of the United States; to declare war; to raise and support armies; to provide and maintain a navy.

Unless the power to declare these notes lawful money is fairly embraced in the terms of the power " to coin money and regulate the value thereof," it must be conceded that it is not within the express letter of any of the powers enumerated.

It is perfectly obvious upon looking into the various provisions of the constitution, that it was the intention to place the entire power of creating money, and determining and regulating its value for the whole country, in the general government; and hence it is forbidden to the several states, by section ten, to " coin money, emit bills of credit, or make anything but gold and silver coin a tender in payment of debts."   Money is the medium of

exchange—the standard or representative of all commercial values. It is that which men receive in exchange and in satisfaction of labor, and its various products; and whether it is intrinsically valuable or otherwise, it is the standard of values by which alone they are all measured. In all civilized governments it consists of coin, of gold, silver and copper, and of bank bills, or bills of credit, issued by the authority of such government.

Gold and silver are not naturally money any more than any other metal product or fabric. They are made so by law only when manufactured into pieces of coin, of prescribed weight and fineness, and stamped with the requisite inscriptions and devices.

These metals are by common consent better adapted for use as money than any other yet discovered, but they become money by the force and operation of law alone.

It is conceded, as I understand the argument, that this power "to coin money and regulate the value thereof," is a power given to congress to enact suitable laws on the subject of the current money of the country. But it is insisted that the power is limited to the enactment of laws for the minting or fabrication of gold and silver only into money, and the regulation of the value of money of that description. This might be so if the language employed had been, "to coin gold and silver into money and regulate the value thereof." But the terms used are, "*to coin money,* and regulate the value thereof." In order, therefore, to place this restriction upon the power, as a matter of judicial construction, it must be made to appear not only that "to coin," signifies shaping and stamping metals exclusively, but also that the term "money," in its ordinary popular signification, at the time the constitution was framed and adopted, meant gold and silver coin, and nothing else.

But neither of these propositions are true. By looking into any dictionary it will be seen that "to coin," means

not only to shape and stamp, or mint metals, but to make or fabricate other things as well. And we cannot but know from the history of the times, that at the adoption of the constitution, neither in this country nor in any other civilized country, did the money in use consist of gold and silver exclusively. It consisted then, as it has ever since, and probably ever will, in gold and silver, and in paper representing gold and silver, in the shape of bank bills or bills of credit.

The power is, in my judgment, most clearly, to make laws, prescribing what the money of the country shall be, and the value of the money thus created by such laws. If it was intended to restrict the exercise of this power to enactments on the subject of gold and silver only, we should naturally expect that some terms would have been chosen clearly expressing such limitations.

The framers of the constitution certainly must be supposed to have known something of what is termed the evils of paper money, and if it was intended to exclude the creation of that species of money from the power of congress, nothing is more rational or natural than that something of the kind should have been said in clear and explicit terms.

If " to coin," is to be restricted in its definition to work upon metals, it applies to other metals as well gold and silver, and proves too much for the argument. It is not claimed that it was the design to have any other species of metal created money by law; and as neither gold nor silver is mentioned as the substance to be coined, I think it must be held, that the power granted is simply to determine by law what the money of the country shall consist of and to regulate its standard value.

Considerable stress is laid upon the debates in the convention in which the constitution was framed, but I think it far safer to look carefully at the constitution as it was adopted, and endeavor to construe it according to its

evident and natural import. It is by no means certain that these debates may not rather mislead than enlighten the judicial mind.

The framers of the constitution were but the agents of the people, to prepare it for their acceptance or rejection, and if we could be certain that we had arrived at the exact meaning of these agents, we might still doubt whether the people, when they ratified and adopted it, did not give it a broader and more generous interpretation.

We can only arrive at their intention with any degree of certainty by attending carefully to the ideas expressed. I can have no doubt that should any other metal, or combination of metals be discovered, which, in the judgment of congress, was more convenient and suitable for use as money than gold and silver, it might by law make such metal or combination money, and prohibit the use of gold and silver as money.

And I have as little doubt that congress has, under this general head of power to make laws on the subject of the money of the country, ample authority to declare and make by law these promises of the government, money, and a legal tender in payment of all debts whatever. This seems to me a fair and reasonable interpretation of the instrument, in view of the subject of the power, the nature and the functions of the body upon which it was conferred, and the purposes for which it was thus conferred.

The interpretation contended for on the part of the plaintiff, so far from being strict and rigid, as is claimed, would, as it seems to me, be exceedingly loose and conjectural in its very narrowness and poverty of apprehension. It is an authority to make a supreme law, and not a mere employment to bestow labor upon metals, as it would seem to be regarded.

It must be admitted that no power is, in express terms, anywhere given in the constitution to congress, to make

Hague agt. Powers.

anything a legal tender in payment of debts, public or private.   The states are prohibited from making anything but gold and silver such legal tender.   But congress is neither prohibited from making a law upon the subject, nor expressly authorized to enact one.   If a direct and explicit authority is needed, it has no power whatever to make gold or silver even, or bullion, or bank notes, or bills of credit, such legal tender.   This power, if it exists in congress at all, is lodged there as a necessary and proper incident only, to the full and perfect exercise of some power expressly granted in the instrument.   And the statute, in this regard, must find its warrant and sanction in the fact of its necessity or propriety as an auxiliary to the legitimate exercise of some one or more of the enumerated and granted powers.

But there is, I think, no serious difficulty in respect to the existence of this power in congress, to provide that a legal tender may be made, in payment and satisfaction of all debts existing within the jurisdiction of the government, whether public or private.   The only controversy which can seriously arise, as it seems to me, must be in regard to what shall be made the legal tender.   It is a power which congress has uniformly exercised, and is clearly an incident to the power to regulate commerce. Contracting and paying debts are strictly part and parcel of commerce.   And under no civilized government can its commercial business be properly regulated, without some specific provision of law, in regard to paying, satisfying and discharging all debts and obligations, not only to the government, but between individuals.   The power to regulate commerce includes the power to make laws for everything which belongs to commerce, a material part of which is the contracting and the payment and final discharge of the debts created thereby.

It is claimed, however, in behalf of the plaintiff, that, conceding to congress the power to provide by a law for

a legal tender, in payment and satisfaction of debts, it is limited in the exercise of such power, by the constitution, to making gold and silver coin only such tender. It is admitted that no such restriction is to be found in the language of the constitution, but it is claimed to be irresistibly inferable from the provision prohibiting the states from making anything else a legal tender. This proposition is wholly untenable. To say, as matter of judicial construction, that a limitation and restriction upon the power of an inferior, by a superior, implies the same limitation and restriction upon the power of the superior, would be in the last degree unwarrantable, within any known rule of construction. The mere statement of such a proposition is its sufficient refutation. Another argument is sought to be derived, against the existence of the power to make paper of this description a legal tender, from what is claimed to have been the uniform practice of the government from the beginning, to make nothing but gold and silver coin such legal tender.

This, if it had been the uniform practice, would be in no respect conclusive, though it would not be entirely without force as an argument. For it is well understood that the general government has many powers which it has never called into exercise, the occasion for their proper exercise having never yet arisen.

But the fact is otherwise. The government has not only issued paper of this description from the beginning, whenever the public exigencies required it, but has generally provided by law that it should be receivable in payment of all public dues. And it was held to be a lawful tender in payment of such dues, by Judge STORY, in Thorndike agt. The United States, (2 Mason, 1.)

It is said in answer to this, that government may properly make such a regulation in regard to its own debts as it chooses, and that it would not follow that it could

make such notes a lawful tender between individuals, if it could in discharge of its own dues.

But this is no answer. The question is not, what the government may do by contract between its agents and other individuals, but what rule it may prescribe as a public and general law.

If congress has no power to pass a law making them a legal tender, any such law would be void, and they could not be lawfully tendered in satisfaction of a debt, even to the government. But if congress has the power to make them a lawful tender in payment of any debt, it may unquestionably make them such in payment of all debts.

The decision, therefore, necessarily affirms the power of congress to make a valid law authorizing the tender in question.

A debt between individuals is no more sacred or removed from the reach of the power of government than one from an individual to the government. The question is, has congress the power to provide by law that they shall be a legal tender in payment of any debt ?

It is thus seen that congress has, in repeated instances, exercised this very power, not to the same extent or in the same degree, perhaps, but identical in kind, whenever in its judgment the necessities or the convenience of the country required it. The power is clearly, in my judgment, one of the attributes of governmental sovereignty, and may be exercised whenever it is deemed necessary or proper by the sovereign authority. And were it even true that these notes could not rightfully be declared and made lawful money, I have no doubt they could still be made a legal tender. Congress having the power to provide for a tender, in satisfaction of a debt, has necessarily the right to declare what the tender shall consist of. It is not a question of policy or expediency merely, but of power. Of the expediency and propriety of the mea-

sure, congress is the sole and exclusive judge. If it has the power to make such a law, its judgment as to the necessity or propriety of it at the time, is conclusive. The courts have no right to question it, except to determine the existence of the power.

It is also claimed that the act is invalid on the ground that it impairs the obligation of contracts by compelling the creditor to receive something less valuable than gold or silver coin in payment of his lawful demands against his debtors.

/ It cannot be denied that it does in one sense and to a material extent impair the obligation of contracts in the particular above stated. But it is not invalid for that reason. The power to pass laws to impair the obligation of contracts is prohibited to the states only, which can pass no law impairing directly or indirectly the obligation of any contract. There is no such limitation upon the power of congress. / The argument that the one implies the other has already been answered. The same effect may, however, be produced by regulating the value of coin, which it is admitted, may properly be made a legal tender. Instances are not wanting in our national legislation of changing, by law, the existing standard or degree of fineness of our coin, and laws making foreign coin a legal tender have been repealed. Congress has also enacted general bankrupt laws, which, to a still greater degree, affect the obligation of contracts, destroying entirely their obligatory force, without the consent of the creditor. Such acts have been held constitutional by the supreme court of the United States and by state courts. In the matter of *Edward Kleim*, (*How. U. S. R.*, 277,) opinion of Mr. Justice CATRON; *McCormic* agt. *Pickering*, (4 *Coms.*, 276;) *Kinzler* agt. *Kohnas*, (5 *Hill*, 317;) *Sacket* agt. *Andross*, (*id.*, 327.)

I do not, however, rely upon these decisions as controlling in the present case. The power to enact a gen-

eral bankrupt law, so manifestly includes in it the power to impair the obligation of contracts brought within the operation of the law, that there scarcely seems room for two opinions on the subject.

They are, however, authority for the proposition, that where the subject of the enactment is clearly within the granted powers, the fact that it incidentally impairs the obligation of contracts furnishes no valid ground of objection that the act is unconstitutional.

- The grant of the power " to make all laws which shall be necessary and proper for carrying into execution the foregoing powers and all other powers vested by this constitution in the government of the United States, or in any department or officer thereof," is an express and not an implied grant. It carries with it and includes in it all legitimate incidents and consequences of the laws thus made, of necessity. It would be a strange and unwarrantable proposition that a law clearly within the letter and spirit of an express power, should be held invalid and unconstitutional, merely because in its operation it affected some particular right or interest injuriously.

But while I am able to find ample authority in the grant of power to regulate commerce, for making the notes in question a legal tender, I do not intend by any means to rest my opinion upon that head of power exclusively. We must of necessity take judicial notice of the alarming and critical condition of the government and of the country. We cannot, if we would, ignore the terrible fact that armed rebellion, by open and flagrant violence, is seeking the overthrow of the government, menacing its complete and total destruction. Nor that the government thus assailed, in order to preserve its existence and restore its rightful authority, is compelled to raise and support powerful armies, and supply them with the munitions of war, to provide and maintain a navy of a magni-

tude wholly unprecedented in our history, involving an expenditure probably of millions of dollars daily. To meet this extraordinary demand, the ordinary means of the government, and, indeed, the ordinary currency of the whole country are entirely inadequate. The government must, therefore, not only borrow upon its credit, but must create, as far as practicable, an additional currency to meet its urgent wants and immediate necessities. The right to borrow, necessarily includes in it the right to promise to pay. But in order to borrow to advantage, or indeed to borrow at all, its promises must necessarily have credit, and should have the highest credit which the government is able to confer upon them. If, in the judgment of congress, it was either necessary or proper, in order to enhance the credit of these government promises, to make them a legal tender in the payment of private as well as public debts, it had unquestionably, as I think, the right to do so, and even to declare them lawful money. It would be but the making of a law necessary and proper for carrying fairly and reasonably into execution several of the powers expressly granted.

That this was the object and purpose congress had in view is evident, not only from the debates when the act was under consideration before that body, but also from the application of the secretary of the treasury to it to insert such a provision in the act.

Amongst other reasons assigned by that officer to congress in favor of this act, he says, "but unfortunately there are some persons and some institutions which refuse to receive and pay them, and whose action tends not merely to the unnecessary depreciation of the notes, but to establish discriminations in business against those who in this matter give a cordial support to the government, and in favor of those who do not." But we can see plainly, aside from this, that it was a means well adapted

to the accomplishment of the purpose, and therefore entirely legitimate. And this brings this feature of the law within the express words of the grant of power, "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers."

I have no hesitation, therefore, in pronouncing this provision of the act in question perfectly in accordance with the plain letter, intent and spirit of the constitution.

I have come to this conclusion upon what has seemed to my mind the plain and necessary construction of the organic law, as it stands written by its framers, and without calling to aid the consideration of those ultimate and extreme powers which every government, having a right to an existence and a place among the nations of the earth, may of necessity employ as a means of self-preservation when assailed by a public enemy with flagrant violence, and thus involved in actual war. No one doubts, I suppose, that any government thus situated may rightfully, if need be, by any suitable means, call to its aid and service the might of every arm and the use of every dollar of the property of each and every subject or citizen within its jurisdiction. These are, however, considerations which it is wholly unnecessary to press into this case.

The defendant is therefore entitled to judgment upon the facts presented by the case.

James C. Smith, J.   I had not the advantage of hearing the oral argument in this case, and but for the great importance of the question involved, might have declined the request of the counsel for both parties, made at the hearing, to consider it upon their printed briefs. While I concur with my associates in their conclusion in this case, I am not prepared to adopt entirely the reasoning expressed by them; and as I have had no opportunity to

write an opinion, I.shall merely state briefly the reasons for my judgment.

I am of .the opinion that the provisions of the act of 25th February, 1862, which are alleged by the plaintiff to be unconstitutional, are within the general scope of the power of congress to borrow money on the credit of the United States, and to make all necessary and proper laws for carrying such power into execution. The power is not only to borrow, but to use the national credit for the purpose; and as the power is unlimited, it includes, incidentally, the right to such use in any and every mode which pertains to the exercise of supreme governmental authority. The *end* being legitimate, and within the scope of the constitution, *all* the *means* which are appropriate and plainly adapted to that end, and which are not prohibited, may constitutionally be employed to carry it into effect. (4 *Wheat.*, 316.) The primary object of the act in question was to borrow immense sums of money which were needed by the government to meet the extraordinary exigencies of the time; and the provisions of the act, that the obligations to be issued should be in a form to circulate as currency, and that they should be a legal tender, were simply modes of using the public credit, which other governments have frequently resorted to, and which our federal government may rightfully employ, as, in respect to the use of public credit for the purpose of borrowing money, it is expressly clothed with unlimited and sovereign power. The act may be regarded as a legislative declaration that the speedy borrowing of large sums of money, upon the national credit, was necessary to the preservation of the government, and that such borrowing could not be effected by any measures less vigorous than those which were adopted. Such being the case, the federal legislature were not only authorized, but were required by the most solemn considerations of duty, as the guardians of the nation, promptly and effi-

ciently to use their supreme power, in respect to the public credit, to its fullest extent, if necessary, and in such mode as in their judgment was essential to the public safety. This, and nothing more, they did by the act in question. Their authority to adapt the notes of the government to the purposes of circulation and tender, in my judgment, stands upon the same ground as their authority to issue treasury notes, and to prescribe their form and terms—both are incidents of the borrowing power.

It is insisted by the plaintiff that the scheme is not to borrow money, but to enable the government to pay out its own promises as money. But as these promises are ultimately to be redeemed by the government, in money, it is manifest that while they are outstanding, the government is in fact a borrower of the sums expressed upon their face.

The plaintiff also insists that the act in question violates the several provisions of the federal constitution, which prohibit (1.) the emission of bills of credit; (2.) the making anything but gold and silver coin a tender in payment of debts; and (3.) the passing of any law impairing the obligation of contracts. These prohibitions apply to the states and not to congress. That no implication can be drawn from them respecting the power of congress over the subject to which they relate, is evident from the fact, that as to a portion of those subjects, the federal legislature are, by other provisions of the constitution, expressly clothed with power; in respect to another portion, they are expressly prohibited from acting; and as to the remainder, authority is neither granted to them nor withheld from them in express terms. The first class comprises the treaty-making power, the power to grant letters of marque and the power to coin money. The second is composed of the power to pass bills of attainder, or *ex post facto* laws, and the power to grant titles of nobility. The third consists of the three powers above

enumerated, to wit : to emit bills of credit, to make other than gold and silver coin a legal tender, and to pass laws impairing the obligation of contracts. These latter powers are obviously not on the same footing as those which are expressly prohibited, or as those which are expressly delegated. As they are not expressly conferred, congress cannot exercise them as independent, substantive.powers; but as they are not prohibited, there is nothing in the fundamental law to prevent congress from employing them, so far as they may be necessary, as means for the exercise of powers clearly given.

Thus the power of congress to employ the credit of the government by issuing its obligations or promises to pay, includes the incidental authority to make such obligations a legal tender in payment of debts, and thus to modify the obligation of contracts, so far as such modification may result from a legitimate exercise of the power delegated, but no further. The obligation of contracts may, in like manner, be affected by the exercise of many other powers of congress; as, for example, the power to coin money and regulate its value, and the power over bankruptcies. The incidental authority over contracts, derived from the latter power, has been judicially asserted. (5 *Hill*, 317; 4 *Comst.*, 276.)

This construction, it seems to me, is borne out by the views of the members of the convention which framed the constitution, expressed in the debates upon the proposition of Gouverneur Morris to strike out of the original' draft the words expressly authorizing congress to emit bills of credit; and also upon the clause which expressly prohibits that power to the states. (*Mad. Papers.*)

But the debates in the convention are a somewhat uncertain guide in construing the constitution. They show that the members of the convention were sometimes disposed to shape the phraseology of the instrument with a reference to the meaning which they supposed the people

would attach to it when it should be presented to them. for adoption. So that, after all, the inquiry must be, what did the people intend by their grant of power, and that must be determined by the language of the grant.

Finally, it is objected that a law impairing the obligation of contracts is against natural justice, and therefore void. If the primary object of the law in question were not within the scope of the power of congress, the law would be void for that reason. But its principal object, as we have seen, is within the power of congress, and it is therefore valid. If the legislature of the Union shall pass a law within the general scope of their constitutional power, the court cannot pronounce it to be void, merely because it is in their judgment contrary to the principles of natural justice. The ideas of natural justice are regulated by no fixed standard; the ablest and purest men have differed upon the subject; and all that the court could properly say in such an event, would be that the legislature (possessed of an equal right of opinion) had passed an act which, in the opinion of the judges, was inconsistent with the abstract principles of natural justice. There are then but two lights in which the subject can be viewed.

1st. If the legislature pursue the authority delegated to them, their acts are valid.

2d. If they transgress the boundaries of that authority, their acts are invalid. In the former case, they exercise the discretion vested in them by the people, to whom alone they are responsible for the faithful discharge of their trust; but in the latter case, they violate a fundamental law, which must be our guide whenever we are called upon as judges to determine the validity of a legislative act. (*Per* IREDELL, J., *Calder* agt. *Bull*, 3 *Dal.*, 399.)

Being satisfied that the act in question is within the power of congress which I have considered, I have not

examined the other positions taken by the counsel on the argument.

I think the defendant is entitled to judgment.

NOTE.—The recent unanimous decision of the supreme court of the United States, in the case of *The People ex rel. Bank of Commerce* agt. *The Commissioners of Taxes, &c.*, ante, page 9, establishing the power of congress to exempt the United States securities from state taxation, as an incident of the power to borrow money, sustains in principle the decision in this case, viz: that congress may make treasury notes a legal tender as necessary and proper for the purpose of giving to them the credit and currency essential to borrowing money thereon, and to raising and maintaining the immense armies and navies demanded by the emergency.